IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**BENJAMIN PITTS,**                                                                           **PLAINTIFF**
**ADC #148011**

V.                         NO. 4:20-cv-00849-KGB-ERE

**DEXTER L. PAYNE,** *et al.*                                                            **DEFENDANTS**

### RECOMMENDED DISPOSITION

This Recommended Disposition ("RD") has been sent to Chief United States District Judge Kristine G. Baker. You may file objections if you disagree with the findings and conclusions set out in the RD. Objections must be specific as to both their factual or legal basis and be filed within fourteen days. If you do not object, you risk waiving the right to appeal questions of fact, and Chief District Judge Baker can adopt this RD without independently reviewing the record.

**I.   Summary**

This case was referred to me for a recommendation regarding Plaintiff Benjamin Pitts' requests to enforce the parties' negotiated settlement agreement ("the Agreement"). The case was closed on December 22, 2022, after the Court approved the Agreement. Since then, Mr. Pitts has filed multiple motions contending that Defendants have not complied with the Agreement. For the reasons explained below, the Court should decline Mr. Pitts' request to reopen the case to enforce the Agreement.

## II.    Background

On July 20, 2020, Mr. Pitts, an ADC inmate housed at the Varner Unit, filed this case alleging that Defendants, all Arkansas Division of Correction ("ADC") officials, interfered with his ability to practice his religion by denying him an exemption from the ADC grooming policy, so he could wear his hair in dreadlocks.

The case eventually settled. *Doc. 57-1*. Pursuant to the Agreement, Mr. Pitts released his claims in exchange for: (1) a religious accommodation to wear his hair in dreadlocks, which would be recorded in his chaplaincy file and the ADC's electronic management system; (2) reversal or dismissal of all disciplinaries he received related to wearing dreadlocks from July 20, 2020 through December 22, 2022[1]; and (3) reclassification to a Class III inmate,[2] placement in the ADC's Step-Down Program,[3] and release into general population *if and when* he completes the Step-Down Program and obtains Class I inmate status. *Doc. 57-1 at 2-5*.

---

[1] The Agreement calls for the reversal or dismissal of all dreadlock-related disciplinaries Mr. Pitts received from July 20, 2020 through "the present date." *Doc. 57-1*. It provides that it "shall not become effective until an Order of Dismissal with prejudice is entered . . . ." *Doc. 57-1 at 5*. Chief District Judge Baker entered the Order and Judgment on December 22, 2022. *Doc. 61*.

[2] This is a classification system based on an inmate's "good behavior, good discipline, medical condition, job responsibilities, and involvement in rehabilitative activities." Class levels effect an inmate's ability to participate in programs and earn good-time credit. *See* Ark. Code Ann. § 12-29-202.

[3] An inmate's Step-Down Program classification level is separate and distinct from his inmate classification level.
   On September 20, 2023, Mr. Pitts filed a copy of ADC Administrative Directive 17-03, which details the "Step-Down Program to assist in reintegrating inmates into general population housing or into the community from a restrictive housing assignment." *Doc. 79 at 7*. An inmate begins the program at Step-Down Level I and, with good behavior, progresses to higher levels that gradually offer increased opportunities and privileges. *Id. at 9-12*. "The length of time [an inmate

The Agreement provides that "Defendants' undertaking . . . is satisfied once [Mr. Pitts] has received his religious accommodation and his class has been changed to 'Class III.'" *Id. at 3*. The Agreement also notes that, after Mr. Pitts' initial upgrade from Class IV to Class III, his "classification status is thereafter dependent upon his future conduct and subject to existing disciplinary and classification processes." *Id*.

On December 22, 2022, Chief District Judge Baker granted the parties' joint motion to dismiss, making the Agreement effective the same day. She retained jurisdiction to enforce the Agreement. *Docs. 61, 62*. On January 19, 2023, Mr. Pitts submitted a *pro se* filing,[4] asserting that Defendants had breached the Agreement. *Doc. 63*. On January 23, 2023, Defendants responded, stating that they were in full compliance with the Agreement. *Doc. 65*. On February 24, 2023, Mr. Pitts filed a "writ of execution" alleging that Defendants failed to: (1) pay his legal fees; (2) provide the religious accommodation; and (3) reclassify him as a Class III inmate or place him in the Step-Down Program. *Doc. 68*. Defendants again responded that they had complied with the terms of the Agreement. *Doc. 70*.

---

is] housed in each step is based on the inmate's behavior and progress in the program." *Id*. at 9. "Any inmate participating in the Step-Down Program that is not meeting the program[']s expectations will be evaluated by the Classification Committee to be possibly 'Stepped Back' one level." *Id*. Considerations that may result in returning an inmate to a lower level include being found guilty of a major disciplinary violation or multiple minor disciplinary reports. *Id. at 9-10*.

[4] Mr. Pitts was represented by counsel when this case settled. His counsel was relieved from further representation on August 28, 2023. *Docs. 69, 71*.

On August 28, 2023, Chief District Judge Baker denied Mr. Pitts' request for costs, but directed Defendants to file a variety of documents to show their compliance with the Agreement. *Doc. 71 at 7.*

On September 11, 2023, Defendants responded with supporting documents[5] showing that: (1) on December 5, 2022, Defendants upgraded Mr. Pitts to Class III and placed him in the Step-Down Program at Level I; (2) on January 18, 2023, Mr. Pitts advanced to Step-Down Level II; (3) on March 27, 2023, Mr. Pitts was upgraded to Step-Down Level III; (4) on April 17, 2023, he received a major disciplinary for possessing contraband, resulting in his placement in restrictive housing; (5) on May 15, 2023, Mr. Pitts' restrictions were lifted, and he was restored to a Class III inmate, Step-Down Level I; (6) on June 14, 2023, Mr. Pitts again was upgraded to Step-Down Level II; and (7) on July 28, 2023, he received a major disciplinary for failure to obey orders, indecent exposure, and insolence to a staff member, resulting in a downgrade to a Class IV inmate and placement in restrictive housing. *Doc. 75 at Ex. A, Ex. B at 2-7, Ex. C at 4-5.*

Defendants also provided an August 2023 photo of Mr. Pitts wearing his hair in shoulder-length dreadlocks and evidence that a copy of the Agreement, which

---

[5] Among other things, the documents include: (1) a sworn declaration by Defendant Gibson, the Varner Unit Superintendent; (2) a printout of Mr. Pitts' classification status and job and program assignments; and (3) documents recording Mr. Pitts' July 28, 2023 major disciplinary. *Doc. 75 at Exs. A-C.*

4

includes Mr. Pitts' religious accommodation, was in his chaplaincy file as of September 11, 2023. *Id. at Exs. D, E, F*.

In support of his request to enforce the Agreement, Mr. Pitts noted that, as of August 28, 2023, there was "no religious accommodation" in his chaplaincy file. *Doc. 72*. He also alleged that, despite documentation showing that Defendants reclassified him as a Class III inmate, Defendants failed to treat him as such or place him in the Step-Down Program, as evidenced by the fact that he was not permitted to leave his cell to participate in Step-Down Program activities. *Doc. 79 at 2*. On September 20, 2023, Mr. Pitts again asserted that he "never received a religious accommodation" and pointed out that he had received a major disciplinary on January 11, 2024 "about his hair." *Doc. 82 at 1*.

On September 24, 2024, Chief Judge Baker denied Mr. Pitts' pending motions and referred the matter to me for a recommendation regarding Mr. Pitts' requests to enforce the Agreement.

On October 1, 2024, I gave the parties thirty days to provide status updates and any other relevant argument or documentation regarding the requests to enforce the Agreement.[6] *Doc. 85*.

---

[6] Specifically, I suggested Defendants address Mr. Pitts' allegations that: (1) he was treated differently than other Class III inmates and had not received opportunities normally available in the Step-Down Program; and (2) as of August 28, 2023, his religious accommodation to wear dreadlocks was not included in his chaplaincy file. In the same Order, I invited Mr. Pitts to explain: (1) whether the accommodation's absence from his chaplaincy file before September 11, 2023 caused him to suffer harm and, if so, how; and (2) whether the January 11, 2024 disciplinary "about

5

On October 18, 2024, Mr. Pitts filed a status report asserting: (1) he was never let out of his cell as a Class III inmate, and Defendants performed a target search of his cell on April 17, 2023; (2) he never received his accommodation and wants to proceed with this case and amend his complaint; (3) Defendants retaliated against him with disciplinaries, including one related to his hair; (4) he was not permitted to participate in activities available to other inmates in the Step-Down Program "because of his hair"[7]; and (5) Defendants never planned to give him an accommodation or comply with the Agreement. Mr. Pitts also cites the fact that there was no release plan for when he achieves Class I inmate status. *Doc. 86*.

On October 31, 2024, Defendants denied the allegations in Mr. Pitts' status report. They assert that the April 17, 2023 search is unrelated to the Agreement and that Mr. Pitts' repeated claims about Defendants denying his religious accommodation and not placing him in the Step-Down Program are "demonstrably false and [have] been debunked multiple times . . . ." *Doc. 87*.

The issues have been fully briefed and are ripe for decision.[8]

---

his hair" is the only disciplinary he has received that allegedly violated the Agreement. Neither party directly responded to these questions.

[7] In support of his allegation that he was not permitted to participate in the Step-Down Program "because of his hair," Mr. Pitts cites Defendant Gibson's April 21, 2021, which was filed *before* the parties entered the Agreement. *Doc. 26-1*. This declaration has no bearing on whether Defendants complied with their contractual obligations.

[8] I gave thoughtful consideration as to whether an evidentiary hearing was needed. However, based on the allegations and the unrefuted proof in the record, I concluded that a hearing was unnecessary.

**III.    Discussion**

Defendant's primary obligations under the Agreement were to provide Mr. Pitts a religious accommodation related to his dreadlocks, reclassify him as a Class III inmate, and place him in the Step-Down Program. *Doc. 57-1 at 2*. The religious accommodation was subject the following conditions:

> a. Plaintiff's dreadlocks must be kept soft and bendable, and in a manner that permits ADC officials to search his hair, when necessary.
>
> b. The maximum length for Plaintiff's dreadlocks will be at the bottom of his shoulder blades.
>
> c. This religious accommodation will be revoked if, at any time, Plaintiff is found to have contraband in his hair.

*Doc. 57-1 at 2*.

> As to programming, the Agreement states:
>
> Currently, the Plaintiff is a "Class IV" inmate. Defendants agree to re-classify Plaintiff to a "Class III" inmate and place Plaintiff in an ADC step-down program in exchange for the dismissal of this action with prejudice. Defendants further agree that should Plaintiff complete the step-down program and obtain "Class I" status, he will be released into general population.

*Id*.

Because the Court retained jurisdiction to enforce the settlement, it has ancillary jurisdiction to enforce the Agreement. See *Kokkeonen v. Guardian Life Ins. Co.*, 551 U.S. 375, 381 (1994) (explaining that when a court's dismissal order retains jurisdiction over the settlement agreement, it has ancillary jurisdiction to enforce the agreement). However, the Court's jurisdiction is limited and does not include the

authority to decide issues beyond the scope of the Agreement, such as new claims of wrongdoing.

In addition, because the terms of the Agreement were reduced to writing, the terms of the Agreement control what Defendants were required to do. "When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Dorchester Minerals, LP v. Chesapeake Exploration, LLC*, 215 F. Supp. 3d 756, 761 (E.D. Ark. 2015) (omitting citation). Here, the Agreement is unambiguous. As a result, the Court can decide as a matter of law what was required by both parties under the written contract.

The issue before the Court is whether Defendants have performed their contractual obligations. If not, it might be appropriate to reopen the case for the purpose of enforcing the Agreement. However, on this record, there is no material factual dispute as to whether Defendants have done what they contracted to do. In addition, the evidence demonstrates that Mr. Green has received the benefit of the bargain he struck to resolve this case.

### A.   Mr. Pitts Allegations Regarding Lack of an Accommodation

The Agreement's primary purpose was to ensure that Mr. Pitts received a religious accommodation to wear his hair in dreadlocks. Other than unsupported, conclusory statements, Mr. Pitts has provided no evidence that Defendants failed to satisfy this term of the Agreement. In fact, Mr. Pitts' argument is refuted by a picture

of him with hair in shoulder-length dreadlocks, an absence of disciplinaries for wearing dreadlocks, and documentation in his chaplaincy file evidencing his right to wear dreadlocks. *Doc. 75 at 4-10, 31, 70.*

Mr. Pitts points to a single disciplinary he received for his hair.[9] However, this disciplinary was for wearing his hair in a ponytail, not dreadlocks. *Doc. 82 at 10-12*. Wearing a ponytail was not a condition of the Agreement. Also, disagreement with ADC's policy regarding ponytails is unrelated to the Agreement.

Mr. Pitts argues that Defendants did not record his religious accommodation in his chaplaincy file within thirty days of the Court approving the Agreement. Arguably, the thirty-day deadline applied only to Defendants' obligation to *provide* the accommodation and to reclassify Mr. Pitts' as a Class III inmate. See *Doc. 57-1 at 2-3*. But assuming the Agreement required Defendants to record the accommodation in Mr. Pitts' chaplaincy file within thirty days of court-approval, this delay does not warrant reopening the case.

Even assuming the accommodation was recorded late, there is no dispute that it was recorded. So, this is not an unperformed obligation in need of enforcement. And importantly, Mr. Pitts has presented no evidence or argument suggesting that

---

[9] The October 1, 2024 Order invited Mr. Pitts to clarify whether a January 11, 2024 disciplinary is the only one he received that allegedly violated the Agreement. He did not respond to this question or provide any additional documentation.

the document-recording delay interfered in any way with his ability to wear his hair in dreadlocks.[10]

Finally, even if Defendants' untimely filing could be considered a breach of the Agreement, it is not a material breach, which means Mr. Pitts' requested relief – "to proceed with suit and amend complaint" or, in legal terms, recission of the Agreement – is not available. See *Boellner v. Clinical Study Centers, LLC*, 378 S.W.3d 745, 753 (2011 Ark.) ("[A] relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the contract; for one party's obligation to perform to be discharged, the other party's breach must be material."). A key factor in determining materiality is "the extent to which the injured party will obtain the substantial benefit that [he] reasonably anticipated." *Id*. The filing delay did not deprive Mr. Pitts of the "substantial benefit" he negotiated under the Agreement, which included the right to wear his hair in dreadlocks and placement in the Step-Down Program, both of which he received.

The purpose of recording Mr. Pitts' religious accommodation in his file was to ensure he received the accommodation and was not punished for wearing dreadlocks. The record is undisputed that since December 22, 2022, Mr. Pitts has

---

[10] Again, the October 1, 2024 Order gave Mr. Pitts the opportunity to explain "whether the absence of documentation of his accommodation in his chaplaincy file before September 11, 2023 cause him to suffer harm and, if so, how." *Doc. 85 at 6.*

been permitted to wear his hair in dreadlocks under the terms and conditions specified in the Agreement. Because Mr. Pitts has obtained the benefit of the agreed-upon religious accommodation, the late recording of the accommodation, even if a technical breach, which was later cured, does not justify reopening the case.

### B. Mr. Pitts' Argument About the Step-Down Program

Mr. Pitts contends that Defendants never placed him in the Step-Down Program and "never showed any evidence he was no rec. no class report or job that [Class III] inmates get because of his hair." *Doc. 86 at 2*.

Based on the unrefuted ADC records, on December 5, 2022, Defendants reclassified Mr. Pitts as a Class III inmate and placed him in the Step-Down Program at Level I. Mr. Pitts advanced to Level III before being convicted of the April 17, 2023 disciplinary. *Doc. 75 at 10, 16-17*. On June 14, 2023, Mr. Pitts again advanced to Step-Down Level II but received another major disciplinary on July 28, 2023, resulting in another "Step Down" to Level I. *Id. at 10, 16.* The fact that Mr. Pitts advanced in the Step-Down Program multiple times strongly refutes his assertion that he was never placed in the program and refused meaningful participation.

Defendants' contractual obligation was only to place Mr. Pitts in the Program, which they did. Mr. Pitts' inability to complete the Step-Down Program or advance to Class I inmate status appears unrelated to Defendants' obligations under the Agreement.

Without specific factual assertions or any evidentiary showing, Mr. Pitts alleges that he was treated differently than other Class III inmates. This is beyond the scope of the Agreement. At best, this is a new claim for retaliation.[11] This case should not be reopened to allow Mr. Pitts to pursue alleged wrongdoing unrelated to the narrow question of whether Defendants have complied with the Agreement.

### C.    Mr. Pitts' Argument About Defendants' Intent

Mr. Pitts asserts that Defendants never intended to give him an accommodation or comply with the Agreement, as evidenced by the fact that no release plan was drawn up for when he achieved Class I inmate status. *Doc. 86 at 2.*

Mr. Pitts' argument is unsupported speculation. Importantly, the Agreement did not require Defendants to create a release plan. It provided only that Defendants allow Mr. Pitts to wear his hair in dreadlocks, promote him to a Class III inmate, and place him in the Step-Down Program. They did all three. Mr. Pitts' failure to obtain Class I status and return to general population is the result of his accumulation of multiple unrelated disciplinaries, not Defendants' failure to satisfy their contractual obligations. Again, at best, Mr. Pitts' allegations may give rise to a retaliation claim, but they provide no cause to reopen this case.

---

[11] Retaliation claims may be pursued only in a new lawsuit and only after exhausting available administrative remedies.

### D. Mr. Pitts' Arguments Unrelated to the Settlement Agreement

#### 1. Cell Confinement and a Cell Search

Mr. Pitts asserts that he was never let out of his cell as a Class III inmate. First, Mr. Pitts' allegation concedes the fact that Defendants *did* reclassify him as a Class III inmate. Under the Agreement, Defendants' obligations were "satisfied once [Mr. Pitts] . . . has been changed to 'Class III.'" *Doc. 57-1 at 3*. Second, even assuming he was treated differently by being confined to his cell, this alleged adverse treatment is beyond the scope of the Agreement. The treatment might support a new claim for retaliation, but it is not grounds for reopening this case.

Mr. Pitts also contends that Defendants performed a target search of his cell on April 17, 2023. *Doc. 86 at 1*. The April 17 search and resulting disciplinary – four months after the parties entered the Agreement – is unrelated to the Agreement. There is no allegation or evidence that the search and disciplinary related to any terms of the Agreement. Against, Mr. Pitts' allegations may support an independent retaliation claim, but they provide no basis for reopening this case.

#### 2. Retaliation

Mr. Pitts contends that Defendants have retaliated against him, including the disciplinary for wearing his hair in a ponytail, which has already been discussed. *Docs. 82, 86 at 1*. Again, retaliation claims cannot be pursued in this case; the only issue is whether the Court should order Defendants to comply with some unfulfilled term of the Agreement.

## IV. Conclusion

Based on the record before the Court, Defendants have performed their contractual obligations required by the Agreement, and Mr. Pitts has received the reasonably anticipated contractual benefits.

IT IS THEREFORE RECOMMENDED THAT Mr. Pitts' requests to enforce the written settlement agreement and reopen this case be DENIED.

Dated 15 November 2024.

_____
UNITED STATES MAGISTRATE JUDGE